**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Gregory E. Smith,

                Plaintiff,

                                            Civ. No. 04-3078 (RHK/AJB)
                                            **MEMORANDUM OPINION**
                                            **AND ORDER**

v.

Don's Paint and Body Shop,

                Defendant.

---

Michele R. Fisher, Nichols Kaster & Anderson, Minneapolis, Minnesota, for Plaintiff.

Kevin R. Coan, Parsinen Kaplan Rosberg & Gotlieb, P.A., Minneapolis, Minnesota, for Defendant.

---

**INTRODUCTION**

      Plaintiff Gregory Smith was terminated from his position at Don's Paint and Body Shop after working there for more than fifteen years. He brought suit claiming that his termination was based on his age and his use of company-provided health benefits in violation of state and federal statutes. Don's Paint has moved for summary judgment arguing that Smith's termination was due to his poor work performance and, in particular, two serious mistakes that he made in the weeks before his termination. For the reasons set forth below, the Court will grant in part and deny in part Don's Paint's Motion for Summary Judgment.

**BACKGROUND**

Don's Paint and Body Shop ("Don's Paint") is a small company in the business of repairing vehicles after they have been in a collision. It was started by Kevin Bartlett's father in 1948 and, since 1982, Kevin Bartlett and his wife have owned and operated it. Generally, three individuals at a time work at Don's Paint: a "body man" who performs the mechanical and body work necessary to restore damaged cars; a painter who primes and paints the cars; and Bartlett—the manager—who manages the overall operations of the business including paperwork, customer relations, and helping out the body man and painter as needed.

In 1988, Smith began working at Don's Paint as the body man doing body, frame, and heavy collision work on damaged vehicles. His employment continued until Bartlett fired him on March 26, 2004. He was 51 years old at the time. Bartlett is five years younger than Smith. Jesse Turnbull, who was 24 years old at the time of Smith's termination, was the painter at Don's Paint in the last years of Smith's employment there.

**The Final Weeks of Smith's Employment.**

According to Bartlett, the events leading up to Smith's termination began in mid-February 2004, when Smith was working on a 1999 Plymouth Neon ("the Neon"). Part of the job on the Neon included replacing the right front suspension of the car. While the record does not contain the exact dates on which the work was done, it is undisputed that Smith worked on the Neon before going home on a Thursday night in mid-February. When Smith returned to work the next day—Friday—Bartlett was "ranting and raving"

about the Neon, claiming that Smith had left a bolt loose on bottom of the car.  (Smith Dep. at 76.)  According to Smith, Bartlett "made a big thing about it.  He wanted [Smith] to go home.  [Smith] told [Bartlett] quit acting like a big baby."  (Id. at 74.)  Bartlett testified that someone could have been injured because of the loose bolt as "[t]he suspension would have fallen off going down the highway."  (Bartlett Dep. at 28.)  At the time, Bartlett told Smith that "this can't continue . . . it just can't happen again."  (Id. at 24.)

Smith contends that when Bartlett found the loose bolt on that Friday morning, Smith had not yet finished working on the car—"[t]he job was not done."  (See Smith Dep. at 75.)  Smith claims that he always reviewed his work after completing a job, and he "didn't get the opportunity to do that" with the Neon.  (Id. at 75-76.)  Smith testified that when he left work on Thursday night the Neon was "on the frame," which made it clear that he had work left to do on the car, though he did not explicitly inform Bartlett or Turnbull of this.  (Id. at 76, 79.)  Bartlett testified that he was not aware that there was still work left to do on the car.  When Bartlett confronted him about the loose bolt, Smith told Bartlett that "he was going to reinspect it, [Smith] said he was going to go over his work and check that."  (Bartlett Dep. at 24.)  Bartlett did not believe him.  (Id.)

A few weeks later, on Friday, March 19, 2004, Elizabeth Smith[1] picked up her

---

[1] Elizabeth Smith is Gregory Smith's niece, although Gregory Smith did not know who owned the Corsica when he was working on it.  When referring to Elizabeth or her mother, Janet, the Court will use their first names so as to avoid confusion, and will continue to refer to the plaintiff as "Smith."

3

Chevrolet Corsica from Don's Paint.  Smith and Bartlett had worked on the car, and Bartlett testified that when the Corsica left the shop on that Friday the brakes were working fine.  (Id. at 13.)  The next Tuesday, March 23, Janet called Don's Paint and spoke to Bartlett.  Janet informed Bartlett that the brakes stopped functioning properly the day before while Elizabeth was driving the Corsica on the highway.  (Id. at 13-14.)  Elizabeth was forced to drive the car on the shoulder of the highway to wait "for the car to slow down on its own" and then she "coasted the car" to a tire shop off the highway—Norm's Tire Sales, Inc. ("Norm's").  (Elizabeth Smith Aff. ¶ 3.)

      Bartlett called Norm's to confirm Janet's story regarding the Corsica's brakes.  A technician at Norm's confirmed that the brakes were not tightened properly which had caused all of the brake fluid to leak from the car while Elizabeth was driving it.  (Bartlett Dep. at 15.)  In fact, the "brake lines were not tightened at either side of the fittings, and were 'finger-loose'—meaning that [the brake technician] was able to move the fitting without using any tools."  (Greg Schaper Aff. ¶ 3.)  Once Bartlett confirmed the brake failure with Norm's, he issued a check to Janet to reimburse her for the work that Norm's did to fix the brakes.  (Coan Aff. Ex. 3.)

      There is no dispute that it was Smith's responsibility to properly tighten the brakes on the Corsica.  (Bartlett Dep. at 17; Smith Dep. at 118-19.)  Smith knew how to connect and disconnect brake lines, and he testified that he did that work on the Corsica.  (Smith Dep. 112-13.)  Smith testified that he specifically recalled tightening the fitting on the Corsica.  (Id. at 118)  However, at a different point in his deposition, he stated: "I can't tell

you what car I worked on the week before.  I work on so many cars.  I did everything.  I did all the cars." (Id. at 56.)

According to Smith, Bartlett informed him of the brake failure later that week ("either the next day or the day after that"). (See Smith Dep. at 105.) Bartlett told Smith that the brake lines "went out" on the Corsica and that "[Smith] didn't tighten up a fitting." (Id. at 117.) In response, Smith stated: "I did tighten it.  I do not do that." (Id. at 117-18.) Bartlett also informed Smith that Elizabeth took the Corsica to Norm's and that "Janet was mad, chomping at [Bartlett]." (Id. at 117, 119.)

On March 26, the Friday following Bartlett's discussions with Janet, Norm's, and Smith about the Corsica, Bartlett terminated Smith's employment.  According to Smith, Bartlett told Smith that he and his wife "made a business decision and they decided to let [Smith] go." (Id. at 127.) At that time, Bartlett did not give Smith a reason for his termination, and Smith did not ask for one—he just "got in [his] truck and left." (Id.) Smith and his son did return to Don's Paint the next day to pick up Smith's tools. (Id. at 128.) According to Bartlett, Smith asked Bartlett why he "did this to him." (Bartlett Dep. at 33.) Bartlett responded that Smith was being terminated because of the "brake line being left loose on the Chev Corsica." (Id.)

**Allegations of Age Discrimination.**

Smith bases his allegations of age discrimination on statements he claims Bartlett and Turnbull made while he was working at Don's Paint.  According to Smith, Bartlett would mumble "you are getting too old, you are losing it under his breath just loud enough

5

so [Smith] could hear it." (Smith Dep. at 152-55.) Smith cannot, however, identify any dates or general time periods during which these comments were made.[2] In mid-February 2004, Smith also overheard Turnbull tell a windshield installer who would stop by Don's Paint occasionally that "the old guy is getting fired." (Id. at 156-57.) After Turnbull made that comment, the windshield installer stopped talking to Smith—from this Smith concluded that Turnbull's comment was "pointed at" him. (Id.) When asked about any other phrases that were used by Turnbull that offended him, Smith responded that he "heard them now and then" but could not "recall what times it was." (Id. at 160.) He said that sometimes Turnbull would mumble "old fucker and shit like that." (Id.) Smith said that Turnbull "would say [it] loud enough so [Smith] would hear it" because Turnbull "got mad at" Smith when Smith corrected his work. (Id.)

Smith also used the phrase "old man" in the context of "joking around with [Bartlett] about [Smith] and him being old." (Id. at 150.) If Bartlett "did something physical in the shop [Smith and Bartlett] would go we are too old for this shit, stuff like that." (Id.) The joking about being old did not offend Smith. (Id. at 151.)

**Allegations of Retaliation in Violation of ERISA.**

For the last few years of his employment, Don's Paint provided health benefits for

---

[2] When asked when the last time Bartlett used the phrase "old man" referring to Smith, Smith responded "I can't recall." (Smith Dep. at 152.) He did testify regarding a specific incident in February 2004 involving work Smith was doing on a truck, where Bartlett told Smith "you are losing it. You are just losing it. Leave it alone. I will finish it." (Id. at 154.) Smith did not testify regarding how this comment was age related.

Smith and Turnbull.  In March 2003, Smith suffered a heart attack and submitted a claim for the medical costs related to it to his health insurance provider.  (Smith Dep. at 38.)  In February or March of 2004 ("towards the end" of his employment with Don's Paint), Bartlett "bitched" at Smith regarding an increase in Don's Paint's insurance premiums.  (Id. at 45-46.)  Smith cannot remember the date on which it occurred, but on the morning of the confrontation, Smith walked into Bartlett's office upon arriving at work.  Bartlett immediately told Smith "you really screwed everybody over in the shop."  (Id. at 54.)  Bartlett then said that he had talked with his insurance representative, and had inquired about why Don's Paint's insurance rates had increased so much.  Smith was told that Bartlett's "insurance guy said it went up because one of his employees had a main hospital visit."  (Id. at 54-55.)  According to Smith, Bartlett then said to Smith: "You had your heart attack."  (Id. at 55.)  Bartlett then said "I'm not going to pay it.  Who's going to pay this[?]"  (Id.)

**Bartlett's Decision to Terminate Smith.**

While Smith claims that he was terminated because of his age and in retaliation for his use of health benefits, Bartlett testified that he decided to terminate Smith after he found out about the bad brake job on the Corsica.  (Bartlett Dep. at 12.)  The possibility of terminating Smith did not ever occur to him before talking to Janet Smith on March 23, 2004.  (Id. at 15-16.)  He testified that he took that whole week to make the decision to terminate Smith because, as he stated: "[Smith] worked for me for 16 years and he had

7

never really given me any reason to have to check his work. I mean he did nice work. We . . . worked well together." (Id. at 23.) This reasoning was behind his initial response to the mistake Bartlett believed Smith made on the Neon as well, which was to give "him the benefit of the doubt." (Id. at 24.)

Bartlett claims that he terminated Smith because of "[p]oor job performance, neglect." (Id. at 28.) Specifically, he considered the incidents with the Neon and the Corsica, both of which he believed were potentially very hazardous oversights on the part of Smith, in making his decision. (Id.)

## STANDARD OF REVIEW

Summary judgment is proper if, drawing all reasonable inferences favorable to the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986). The moving party bears the burden of showing that the material facts in the case are undisputed. See Celotex, 477 U.S. at 322; Mems v. City of St. Paul, Dep't of Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000). The court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party. See Graves v. Arkansas Dep't of Fin. & Admin., 229 F.3d 721, 723 (8th Cir. 2000); Calvit v. Minneapolis Pub. Schs., 122 F.3d 1112, 1116 (8th Cir. 1997). The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue

for trial. See Anderson, 477 U.S. at 256; Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

## ANALYSIS

Smith claims that he was terminated because of his age in violation of the Minnesota Human Rights Act ("MHRA"), and in retaliation for protected conduct in violation of the Employee Retirement Income Security Act ("ERISA"). Don's Paint alleges that Smith's termination was based on legitimate concerns regarding the deteriorating quality of Smith's work. The Court will first address Smith's allegations of age discrimination, and will then examine his ERISA claim.

**I.     Smith's MHRA Claim.**

The MHRA forbids an employer from taking an adverse employment action against an employee because of his age. Minn. Stat. § 363A.02. A plaintiff may establish a claim of intentional age discrimination by either direct or circumstantial evidence. See Hoover v. Norwest Private Mortgage Banking, 632 N.W.2d 534, 542 (Minn. 2001); Mayer v. Nextel West Corp., 318 F.3d 803, 806 (8th Cir. 2003). Where a plaintiff presents direct evidence that age played a motivating part in the defendant's employment decision, the defendant must then convince the trier of fact that, more likely than not, it would have made the same decision absent consideration of the plaintiff's age. See EEOC v. Liberal R-II Sch. Dist., 314 F.3d 920, 922 (8th Cir. 2002) (citation omitted). Where the plaintiff presents only circumstantial evidence of discrimination, the familiar burden-shifting analysis of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 800-04 (1973), applies.

Smith contends that he has direct evidence of age discrimination, consisting of statements made by Bartlett and Turnbull.

**A.     Direct Evidence.**

"The Supreme Court has defined direct evidence in the negative by stating that it excludes 'stray remarks in the workplace,' 'statements by nondecisionmakers,' and 'statements by decisionmakers unrelated to the decisional process itself.'" <u>Liberal R-II Sch. Dist.</u>, 314 F.3d at 923 (quoting <u>Price Waterhouse v. Hopkins</u>, 490 U.S. 228, 277 (1989)).  The Eighth Circuit has stated that

> direct evidence may include evidence of actions or remarks of the employer that reflect a discriminatory attitude. . . .  In addition, comments which demonstrate a discriminatory animus in the decisional process . . . or those uttered by individuals closely involved in employment decisions may constitute direct evidence within the meaning of <u>Price Waterhouse</u>. . . .  As we recently stated, the direct evidence required to shift the burden of proof is evidence of conduct or statements by persons involved in making the employment decision directly manifesting a discriminatory attitude, of a sufficient quantum and gravity that would allow the factfinder to conclude that attitude more likely than not was a motivating factor in the employment decision. . . .  Finally, the [plaintiff] must present evidence showing a specific link between the discriminatory animus and the challenged decision.

<u>Id.</u> (internal quotations and citations omitted).

Here, Bartlett was the "decisionmaker" vis-a-vis the challenged employment decision—Smith's termination.  Smith argues that the mumbled comments made by Bartlett such as "you are getting too old, you are losing it" are direct evidence that age was a motiving factor in the decision to terminate him.  Don's Paint responds that the alleged comments are stray remarks, completely unrelated to the decision making process, and that

CASE 0:04-cv-03078-RHK-AJB   Document 33   Filed 05/11/05   Page 11 of 20

Smith's testimony is lacking any detail regarding the context in which such statements were made. The Court agrees.

Smith has not presented any evidence linking the alleged statements made by Bartlett to a time period even remotely close to the decision to terminate him on March 26, 2004. See, e.g., Simmons v. Océ-USA, Inc., 174 F.3d 913, 916 (8th Cir. 1999) (stating that "[b]ecause the [racially offensive] statements and the adverse employment decision were not close in time, [the plaintiff] must establish a causal link between the comments and his termination"). The only comments that Smith was able to recall with some degree of specificity—that Bartlett said "you are losing it. You are just losing it. Leave it alone. I will finish it" regarding a truck Smith was working on (id. at 154)—did not reference his age. See id. at 916 n.2 (only considering the "specifically identified" racially offensive joke despite the fact that the plaintiff claimed to have "presented evidence that [the employer] told racially offensive jokes on a continuing basis").

Furthermore, Smith does not present any evidence regarding the context in which Bartlett muttered that Smith "was getting too old." See, e.g., Whitley v. Peer Review Sys., Inc., 221 F.3d 1053, 1056 (8th Cir. 2000) (noting the offensive comments highlighted by the plaintiff, "[w]hen considered in context" did not "support the racially-derogatory meaning" that the plaintiff put forth). Given that Smith conceded that he joked with Bartlett about their getting "too old" together (see Smith Dep. at 150) and that Bartlett was only 5 years Smith's junior, the Court is unable to conclude that such vague assertions

11

suffice as direct evidence that Smith was the victim of intentional age discrimination.[3]

**B.    McDonnell Douglas.**

In the absence of direct evidence, the Court will evaluate Smith's claims under the McDonnell Douglas burden-shifting framework.  Under McDonnell Douglas, the plaintiff must first establish a prima face case.  "As applied to the discriminatory discharge setting, the plaintiff must show that [he]: (1) is a member of [a] protected class; (2) was qualified for the position from which [he] was discharged; and (3) was replaced by a non-member of the protected class."  Hoover, 632 N.W.2d at 542.

If the plaintiff establishes a prima facie case, the defendant "must meet a burden of production in the second step to articulate a legitimate, non-discriminatory reason for the adverse employment action."  Hannoon v. Fawn Eng'g Corp., 324 F.3d 1041, 1046 (8th Cir. 2003) (citation omitted) (Title VII case).  Finally, if the defendant fulfills this second step, the burden returns to the plaintiff to establish that the defendant's reason is a mere pretext for discrimination.  Id.

Don's Paint argues that Smith has failed to establish a prima facie case of age discrimination because he has not presented evidence that he was qualified for his position at the time of his termination.  (See Reply Mem at 4.)  It points to the incidents involving

---

[3]The comments made by Turnbull likewise are not direct evidence of age discrimination.  There is no allegation that Turnbull was a decisionmaker regarding Smith's termination, nor that he was at all associated with the decision making process.  Furthermore, the comments attributed to Turnbull are not sufficiently probative of age based animus to constitute direct evidence of discrimination.

the Neon and the Corsica in the weeks preceding Smith's termination as support for the contention that Smith was not meeting Don's Paint's legitimate expectations. While the Court agrees that Smith's prima facie showing is not compelling or strong, it will assume for the purposes of this Motion that Smith has established a prima facie case.

Don's Paint has satisfied its burden to come forward with a legitimate, non-discriminatory reason for Smith's termination—that he had not been performing well and, specifically, had been making dangerous mistakes. See Richmond v. Board of Regents of the Univ. of Minn., 957 F.2d 595, 598 (8th Cir. 1992) (recognizing that "unsatisfactory job performance" is a legitimate, non-discriminatory reason defeating a claim of discriminatory termination). Thus, the burden shifts to Smith to "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Hitt v. Harsco Corp., 356 F.3d 920, 924 (8th Cir. 2004) (internal quotations omitted).

Smith attempts to prove that Don's Paint's proffered justification is pretextual by arguing that it was obvious that he was still working on the Neon when Bartlett found the loose bolt on that car, and that he did not fail to tighten the brakes on the Corsica. The Eighth Circuit's consideration of similar arguments in Hitt is instructive. In that case, the plaintiff was terminated after his employer determined he had been involved in a fight. Id. at 923. The plaintiff claimed that his employer was mistaken in its determination that he had been fighting, and pointed out that the decisionmaker admitted after the fact that the decision to terminate the plaintiff had been "misinformed." Id. at 924. The court rejected

13

the plaintiff's argument, stating

> The difficulty with this contention is that it focuses on the wrong question. The key question in a discrimination case like this one is not whether [the plaintiff] was truly fighting, but whether the employer really <u>believed</u> that he was fighting, such that the termination was based on a non-discriminatory reason.

<u>Id.</u> (emphasis in original) (citation omitted). The court held that the evidence showed the employer did believe that the plaintiff was involved in a fight and "[t]hese undisputed facts provided [the employer] with a legitimate, non-discriminatory basis for termination, even if [the plaintiff] could now show that the witnesses were wrong in what they reported about the altercation." <u>Id.</u> at 924-25; <u>see also</u> <u>Calder v. TCI Cablevision of Mo., Inc.</u>, 298 F.3d 723, 730 (8th Cir. 2002) (noting that plaintiff's allegations that some mistakes attributed to her were not her fault "[a]t most . . . demonstrates only that the management may have been misguided as to some of the reasons for terminating [the plaintiff], not that they discriminated against her").

<u>Hitt</u> makes clear that Smith's arguments disputing the wisdom of the decision to terminate him based on the incidents with the Corsica and the Neon do not address the relevant issue, which is whether Bartlett "really <u>believed</u>" that Smith was responsible for the serious mistakes on those cars. Smith has not presented any evidence to call Bartlett's beliefs regarding the incidents with the Corsica or the Neon into question. Accordingly, the Court determines that Smith's assertions that he was not actually responsible for the mistakes preceding his termination do not create a triable issue of material fact as to Bartlett's motivation for terminating his employment.

Smith also asks the Court to draw an inference of age discrimination from the fact that Bartlett and Turnbull made age related comments about him.  When considering a motion for summary judgment, the focus of the inquiry "always remains on the ultimate question of law: whether the evidence is sufficient to create a genuine issue of fact as to whether the employer intentionally discriminated against the plaintiff because of [the protected characteristic]."  Strate v. Midwest Bankcentre, Inc., 398 F.3d 1011, 1018 (8th Cir. 2005) (internal quotation omitted) (alteration in original).  Thus, the Court must determine whether Smith's evidence of age-related comments in the workplace is sufficient to raise an issue of fact as to whether Don's Paint intentionally discriminated against him because of his age.

Regarding Turnbull, "such comments are not persuasive evidence of motive when the remarks are made by persons other than a decisionmaker."  Hitt, 356 F.3d at 925 (citation omitted) (considering allegations that the plaintiff's supervisor made comments referring to the plaintiff as "old man" with regularity).  Likewise, Smith's allegations with respect to Bartlett's comments are so vague as to both the time period and the context in which they were made, that a reasonable jury could not find them probative of Bartlett's motivation.  This is particularly so in light of Don's Paint's evidentiary showing as to Bartlett's non-discriminatory reasons for terminating Smith.  See, e.g., Montgomery v. John Deere & Co., 169 F.3d 556, 560-61 (8th Cir. 1999) (finding that the plaintiff did not establish pretext based on evidence of supervisor's frequent reference to the plaintiff as "old fart" standing alone); see also Ruby v. Springfield R-12 Sch. Dist., 76 F.3d 909, 912

(8th Cir. 1996) (in considering comments made by the plaintiff's supervisors, holding that "no reasonable fact finder could, merely on these comments, find that [the employer's] reasons for adverse action were pretextual for discrimination" (citation omitted)). Accordingly, considering the weakness of Smith's prima facie showing and the lack of any other evidence of pretext to suggest Bartlett engaged in intentional age discrimination, Bartlett's comments alone are not sufficient to create an inference of age discrimination. See Montgomery, 169 F.3d at 560; see also Océ-USA, 174 F.3d at 916 ("Given the comprehensive objective evidence presented by [the employer of the plaintiff's] poor job performance, the offensive remarks made by [the plaintiff's supervisor] outside of the decision making process, without more, are not enough to create a trialworthy issue of pretext." (internal quotation and citations omitted)).

## II.    Smith's Claim of Retaliation in Violation of ERISA.

Smith also claims that Don's Paint retaliated against him for his use of health benefits in violation of ERISA. Under § 510 of ERISA, it is unlawful to discharge "a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan." 29 U.S.C. § 1140. Section 510 offers protection to employees against adverse action taken because a health-plan participant availed himself of an ERISA right. See Coomer v. Bethesda Hosp., Inc., 370 F.3d 499, 506 (6th Cir. 2004). Claims brought pursuant to § 510 are analyzed under McDonnell Douglas. Curby v. Solutia, Inc., 351 F.3d 868, 871 (8th Cir. 2003). To establish a prima facie case, a plaintiff "must prove that he participated in a statutorily protected activity; that an

16

adverse employment action was taken against him; and that a causal connection existed between the two." Id. (internal quotations and alterations omitted).  To establish a causal connection between his participation in an insurance plan and his termination, a plaintiff must present either "direct evidence of retaliation or circumstantial evidence such as proof that the discharge followed an exercise of protected rights so closely in time as to justify an inference of retaliatory motive."  Mathews, 143 F.3d at 1166 (internal quotation omitted).

As in other contexts in which the McDonnell Douglas burden shifting scheme is utilized, a defendant "may rebut the plaintiff's prima facie case by advancing a legitimate, non-retaliatory reason for the adverse action," which then triggers the plaintiff's duty to "demonstrate the defendant's proffered reason was a pretext for illegal retaliation." Shanklin v. Fitzgerald, 397 F.3d 596, 603-604 (8th Cir. 2005) (internal quotations omitted) (discussing retaliation under Title VII and the Missouri Human Rights Act).  However, even if a plaintiff fails to demonstrate that the defendant's proffered reason was false, he may still prevail at summary judgment by presenting evidence sufficient to raise an issue of material fact as to whether he was subject to illegal retaliation.  See Strate, 398 F.3d at 1018.

While Smith suffered his heart attack about a year before his termination, Smith bases his claim of ERISA retaliation on his allegation that he had a conversation with Bartlett in February or March of 2004—just a few weeks before he was terminated—during which Bartlett blamed Smith for the rise in Don's Paint's insurance

premiums.  (Mem. in Opp'n at 8.)  Specifically, Smith claims that Bartlett told him he "screwed the whole shop over" because his heart attack caused Don's Paint's insurance premiums to increase.[4]  (Smith Dep. at 46-56.)

Don's Paint again argues that Smith has failed to establish a prima facie case of ERISA retaliation because it has shown that he was not performing satisfactorily at the time of his termination.  The Court has doubts regarding the strength of Smith's prima facie showing of an ERISA violation, see, e.g., Erenberg v. Methodist Hosp., 357 F.3d 787, 793 (8th Cir. 2004) (holding that the plaintiff did not establish a causal connection necessary for a prima facie showing of retaliation where her job performance was not satisfactory), but it is satisfied that, given his claim that Bartlett blamed Smith for the increased health insurance rates, Smith has established a prima facie case.

While Smith's evidence establishes a prima facie case of ERISA retaliation, he is unable to establish that the reason advanced by Don's Paint for his termination—poor performance—is a pretext for discrimination.  Furthermore, the incident with the Corsica immediately preceding his termination was of such a serious nature that a jury could certainly determine that Don's Paint was justified in its decision to terminate Smith.  See Calder, 298 F.3d at 731 (engaging in protected activity "does not clothe [the plaintiff] with

---

[4]It is worth noting that Bartlett does not deny having a conversation about the increased premiums with Smith.  (See Bartlett Dep. at 41-42.)  He does deny, however, blaming Smith for the increase, or saying Smith "really screwed the business over."  (Id. at 41.)  He also claims that the conversation took place between November 2003 and February 2004.  (Id. at 42.)  These factual disputes are for a jury to resolve.

immunity for past and present inadequacies, [and] unsatisfactory performance" (internal quotation omitted)).

However, as stated above, the Court is mindful that a plaintiff claiming retaliation "may succeed in resisting a motion for summary judgment where the evidence, direct or circumstantial, establishes a genuine issue of fact regarding an unlawful motivation for the adverse employment action . . . even though the plaintiff may not be able to create a genuine doubt as to the truthfulness of a different, yet lawful, motivation." Strate, 398 F.3d at 1018 (footnote omitted). Thus, the Court determines, that while Don's Paint has an undeniably legitimate and compelling non-discriminatory reason for having terminated Smith, the evidence presented by Smith that Bartlett blamed him for the increased premiums just weeks before his termination creates a genuine issue of material fact as to whether retaliation for Smith's exercise of protected activity under ERISA "was a motivating factor in the decision to terminate" him.[5] Id. at 1021 (emphasis added).

---

[5] Although the Court has concluded that summary judgment is not appropriate on Smith's ERISA retaliation claim, it notes that Smith's evidence, as presented to the Court in opposition to the instant motion, is minimally sufficient to establish a genuine issue of material fact with respect to whether Smith's use of health benefits was a motivating factor in his termination. Smith may be unable to satisfy his burden of proof at trial and the determination herein will not preclude Don's Paint from making a Rule 50(a) motion.

**CONCLUSION**

Based on the foregoing, and all the files, records and proceedings herein **IT IS ORDERED** that Defendant's Motion for Summary Judgment (Doc. No. 10) is:

I. **GRANTED** with respect to Gregory Smith's MHRA age discrimination claim and that claim is **DISMISSED WITH PREJUDICE**; and

II. **DENIED** with respect to Gregory Smith's ERISA retaliation claim, and that claim remains for trial.[6]

Dated: May  11 , 2005                                   s/Richard H. Kyle
                                                        RICHARD H. KYLE
                                                        United States District Judge

---

[6] The parties disagree as to whether monetary relief is available to Smith under ERISA. Specifically, Don's Paint contends that Smith cannot recover any monetary relief in the form of back or front pay because only equitable relief is available under ERISA. (Mem. in Supp. at 19-20 (relying on Williams v. Pinkerton's, Inc., 2005 WL 165388 (D. Minn. Jan 24, 2005) (ADM/AJB)).) Smith responds that back and front pay is available under ERISA. (Mem. in Opp'n at 16 (relying on Schwartz v. Gregori, M.D., 45 F.3d 1017 (6th Cir. 1995)).) The Court will not resolve the scope of relief available to Smith under ERISA at this time, as it determines that this issue is more appropriately dealt with at trial.